**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| **CANDICE COOLEY,**<br>*Plaintiff,*<br><br>**v.**<br><br>**UNITED PARCEL SERVICE,**<br>*Defendant.* | **Civil No. 24-2404** |

**MEMORANDUM**

**COSTELLO, J.** **October 19, 2026**

Plaintiff Candice Cooley decided to go on a cruise over the Christmas holidays despite her employer, Defendant United Parcel Service ("UPS"), explicitly denying her leave request and warning her that taking unauthorized leave during its busiest time of year could result in her termination. After Plaintiff returned and received a disciplinary notice informing her that further action was pending, she disclosed for the first time that she was pregnant. UPS went forward with her termination as planned. Plaintiff then sued UPS alleging pregnancy discrimination under Title VII and the Pennsylvania Human Relations Act ("PHRA"), alongside a claim for interference under the Family and Medical Leave Act ("FMLA"). UPS moved for summary judgment on all claims. Because UPS terminated Plaintiff for insubordination and initiated her termination well before anyone at UPS knew of her pregnancy, Plaintiff cannot raise a genuine dispute of material fact with respect to her claims. Accordingly, the Court will grant UPS' motion.

## I. BACKGROUND

UPS hired Plaintiff as a Human Resources Specialist in 2016. Mem. Supp. Def.'s Mot. for Summ. J. at 3 (ECF No. 54). Plaintiff later transitioned to sales and eventually became a

Senior Account Executive, which was her role leading up to and at the time of her termination. *Id.* at 3-4. In this position, Plaintiff was required to work directly with UPS's business customers. *Id.* at 4. She reported to Area Sales Director Joe McCormack, who in turn reported to Director of Sales Shannon Kotait. *Id.*

**A. Categories of Leave at UPS**

UPS offers several categories of leave. Under UPS's Vacation Plan, employees must schedule vacations in advance and "give as much notice as possible." ECF No. 54 at 5. All vacation time must be pre-approved by a manager or supervisor. *Id.* Additionally, in many locations, vacations may not be taken during peak business periods, which includes the holiday season between Thanksgiving and Christmas. *Id.* Because communication with clients is vital during this season, most UPS employees, including all sales employees, are prohibited from taking vacation during this "blackout period." *Id.* at 6.

Separate from vacation days, some UPS employees receive "discretionary days." *Id.* UPS does not have a written policy governing discretionary days, but they are intended for unexpected, short-term disruptions, like medical appointments or family emergencies. *Id.* at 6-7. Discretionary days are not meant to be used as a substitute for vacation days. *Id.* Additionally, discretionary days are subject to manager approval, and they may not be taken during the blackout period. *Id.* at 7.

Non-union employees, like Plaintiff, may also take twelve weeks of FMLA leave for the birth of a child, and UPS provides paid parental bonding leave through the company's short-term disability benefit. *Id.* To initiate such leave, employees must contact UPS's third-party leave administrator. *Id.* FMLA and short-term disability are exempt from the blackout period restrictions. *Id.*

### B. Plaintiff's Cruise and Related Vacation Request

On August 31, 2022, Plaintiff booked a cruise that was scheduled to take place from December 18-26, 2022, dates that fall within the blackout period. *Id.* at 8. Plaintiff booked the cruise without requesting those dates off or obtaining approval in advance. *Id.* The cruise was fully refundable until September 20, 2022. *Id.*

On September 7, 2022, Plaintiff emailed McCormack, stating she would be out of office from December 19 through December 29 for a family cruise and planned to use five vacation days and three discretionary days. *Id.* She added that if her time off request was rejected, she would "just have to work remotely from a cruise ship." *Id.* McCormack denied the request immediately, citing the needs of her customers and the blackout period. *Id.* at 9.

The next day, McCormack and Kotait met with Plaintiff to discuss her request. *Id.* Kotait strongly discouraged Plaintiff from taking the trip. *Id.* The parties' recollections of this meeting conflict. Plaintiff asserts that Kotait told her that it would be a "one time deal," leading her to believe that it was okay to take the vacation. Pl. Dep. at 23-24 (ECF No. 53). Conversely, Kotait testified that she has no recollection of making such a statement, Kotait Dep. at 85 (ECF No. 52), and McCormack similarly did not recall Kotait authorizing a one-time deal. McCormack Dep. at 87 (ECF No. 49).

Regardless, on October 18, 2022, McCormack sent a formal email explicitly warning Plaintiff that taking unauthorized leave during the blackout period would be treated as insubordination and could result in her termination. ECF No. 54 at 9. Despite this warning, Plaintiff informed McCormack on December 12, 2022, that she still intended to take the cruise. *Id.* at 10. She proposed a revised leave request where she would take five discretionary days from December 19-23 and vacation days from December 27-30. *Id.* McCormack said he could

approve the vacation days occurring after Christmas but reiterated that he could not approve the requested leave for December 19-23. *Id.* Plaintiff countered that she believed discretionary days were exempt from the blackout period. *Id.* No further communication occurred, and McCormack never approved Plaintiff's request for the days before Christmas. *Id.*

Plaintiff took the cruise and did not report to work from December 19 through January 2, 2023. *Id.* at 11. Because of her absence, Plaintiff left her customers without support during the week leading up to Christmas, and McCormack had to manage her customers during this time. *Id.*

### C. The Termination Recommendation, Review, and Plaintiff's Disclosure

When Plaintiff failed to report for work, Kotait formally recommended Plaintiff's termination to Human Resources Director Rick Corral. *Id.* As was the practice at UPS, Corral planned to review Cooley's proposed termination with legal counsel. *Id.* This review was scheduled to occur at a standing monthly meeting set for later in January 2023. *Id.* at 11-12. As a result, Kotait's termination recommendation was still pending when Plaintiff returned to work on January 3, 2023. *Id.* at 12.

On the day she returned, Kotait and McCormack had a telephone conference with Plaintiff to notify her that her unauthorized absence was considered insubordination, and disciplinary actions were pending corporate approval. *Id.* UPS logged this discussion as an "Initial Disciplinary Action," documenting that Plaintiff did not follow instructions and took time off during December after she was told her time was not approved. *Id.* This write-up noted that there could be further consequences based on Plaintiff's actions. Initial Disciplinary Action at 1 (ECF No. 53-13).

After Kotait disconnected from the call, Plaintiff remained on the line with McCormack. ECF No. 54 at 13. During this time, Plaintiff told McCormack that she was pregnant. *Id.* He congratulated her. *Id.* Plaintiff did not disclose her pregnancy to anyone else at UPS. *Id.* Additionally, Plaintiff never requested or filed for FMLA leave with the third-party administrator. *Id.*

Later that month, Corral completed the corporate review of Kotait's termination recommendation with legal counsel and approved Plaintiff's termination. *Id.* McCormack did not participate in or provide input regarding the final disciplinary determination. *Id.* UPS terminated Plaintiff's employment for insubordination on January 23, 2023. *Id.*

Plaintiff subsequently brought this action, alleging pregnancy discrimination claims under Title VII and the Pennsylvania Human Relations Act ("PHRA") along with claims of FMLA interference and retaliation. *See generally* Compl. (ECF No. 1). UPS moved for summary judgment on all claims. *See generally* Def.'s Mot. for Summ. J. (ECF No. 54). Plaintiff opposed the motion. *See generally* Pl.'s Opp. (ECF No. 55).

## II. LEGAL STANDARD

Summary judgment is appropriate if the movant shows "that there is no genuine dispute as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "To defeat a motion for summary judgment, there must be a factual dispute that is both material and genuine." *Bennett v. SEPTA*, No. 23-cv-1271, 2024 WL 404959, at *6 (E.D. Pa. Feb. 2, 2024), *aff'd sub nom.*, *Bennett v. Se. Pa. Transp. Auth.*, No. 24-cv-1376, 2025 WL 1248815 (3d Cir. Apr. 30, 2025). A fact is material if it "might affect the outcome of the suit under the governing law[.]" *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute over a material fact is "genuine" if, "based on the evidence, 'a reasonable jury could

return a verdict for the nonmoving party.'" *Bennett*, 2024 WL 404959, at *6 (quoting *Anderson*, 477 U.S. at 248).

The movant bears the initial burden of demonstrating the absence of a genuine dispute of material fact. *Goldenstein v. Repossessors Inc.*, 815 F.3d 142, 146 (3d Cir. 2016). "When the movant is the defendant, they have the burden of demonstrating that the plaintiff 'has failed to establish one or more essential elements of her case.'" *Bennett*, 2024 WL 404959, at *6 (quoting *Burton v. Teleflex Inc.*, 707 F.3d 417, 425 (3d Cir. 2013)). "In such a situation, there can be 'no genuine issue as to any material fact,' since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323-24 (1986). "If Plaintiff fails to raise a genuine dispute of material fact as to any element of his *prima facie* case, summary judgment in favor of Defendant is warranted." *Hanafy v. Hill Int'l, Inc.*, 669 F. Supp. 3d 419, 433 (E.D. Pa. 2023) (citing *Geraci v. Moody-Tottrup, Int'l, Inc.*, 82 F.3d 578, 580 (3d Cir. 1996)).

The Court does not weigh evidence or make credibility determinations at the summary judgment stage. Rather, it simply determines "whether there is a genuine issue for trial." *Bennett*, 2024 WL 404959, at *6 (citing *Anderson*, 477 U.S. at 249). "The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient" to create a triable issue; "there must be evidence on which the jury could reasonably find for the plaintiff." *Anderson*, 477 U.S. at 252.

## III. DISCUSSION

### A. Title VII and PHRA – Pregnancy Discrimination

Plaintiff's Title VII and PHRA pregnancy discrimination claims are subject to the *McDonnell Douglas* burden-shifting framework.[1] *See May v. PNC Bank*, 434 F. Supp. 3d 284, 293 (E.D. Pa. 2020) (citing *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973)). Under this framework, a plaintiff must first establish a prima facie case of discrimination. *Id.* at 294. If a plaintiff establishes a prima facie case, "the burden of production shifts to the employer to articulate some legitimate, nondiscriminatory reason for the adverse employment action." *Doe v. C.A.R.S. Protection Plus, Inc.*, 527 F.3d 358, 369-70 (3d Cir. 2008). If the defendant meets this burden, then the plaintiff must show that "the legitimate reasons offered by the defendant are merely a pretext for discrimination." *Id.*

#### 1. Plaintiff's Prima Facie Case

To establish a prima facie case, a Plaintiff must prove that: "(1) she belongs to a protected class (female or pregnant); (2) she was qualified for the position; (3) she was subject to adverse employment action; and (4) the adverse action occurred under circumstances that give rise to an inference of discriminatory action." *May*, 434 F. Supp. 3d at 294 (citing *Frintner v. TruePosition*, 892 F. Supp. 2d 699, 708 (E.D. Pa. 2012)). Pregnancy discrimination claims also require an employer's knowledge of pregnancy. *Doe*, 527 F.3d at 365; *Turevsky v. FixtureOne Corp.*, 904 F. Supp. 2d 454, 463 (E.D. Pa. 2012)).

The parties primarily dispute the fourth element—whether the adverse action occurred under circumstances giving rise to an inference of discrimination. *See* ECF No. 54 at 16-19;

---

[1] Title VII and PHRA claims are governed by the same standards, and the Court will therefore analyze them together. *See Edwards v. Albert Einstein Med. Ctr.*, 533 F. Supp. 3d 215, 220 n. 2 (E.D. Pa. 2021).

ECF No. 55 at 14-15. A plaintiff may rely on a "broad array of evidence" to establish this element. *Parish v. UPMC Univ. Health Ctr. of Pittsburgh*, 373 F. Supp. 3d 608, 635 (W.D. Pa. 2019) (citing *LeBoon v. Lancaster Jewish Cmty. Ctr. Ass'n*, 503 F.3d 217, 233 (3d Cir. 2007)). "Such evidence may include a temporal proximity between the protected activity and the adverse action, intervening antagonistic behavior on the part of the employer, inconsistencies in the employer's articulated reasons for taking the adverse action or any other evidence that supports an inference of retaliatory animus." *Id.*; *see also Ahern v. Eresearch Technology, Inc.*, 183 F. Supp. 3d 663, 669 (E.D. Pa. 2016) ("The fourth element, the nexus between the pregnancy and the adverse employment decision, can be established several ways.").

Plaintiff argues that the circumstances surrounding her termination give rise to an inference of discrimination because UPS terminated her less than thirty days after she told McCormack she was pregnant. ECF No. 55 at 14-15. She further suggests that her taking unapproved leave had been addressed through a warning and prior discipline, and it was only escalated to termination after her disclosure. *Id.* This argument ignores the record evidence, including an undisputed timeline that shows her termination was set in motion before her disclosure.

Crucially, "an employer need not refrain from carrying out a previously reached employment decision because an employee subsequently claims to be engaging in protected activity." *Curay-Cramer v. Ursuline Acad. of Wilmington, Del., Inc.*, 450 F.3d 130, 137 (3d Cir. 2006) (citing *Clark County Sch. Dist. v. Breeden*, 532 U.S. 268, 272 (2001)). Simply put, an employee may not use a subsequent protected disclosure to retroactively insulate herself from the consequences of independent, non-protected misconduct. *Id.* To hold otherwise would place

employers in a "judicial straight-jacket" preventing them from following through on legitimate disciplinary tracks. *Id.*

The undisputed record here shows the exact scenario contemplated in *Curay-Cramer*. The termination decision did not follow Plaintiff's pregnancy disclosure; it followed her decision to take unapproved leave to go on a cruise during a blackout period. Months before the cruise, Plaintiff was warned that taking unauthorized leave during the blackout period would be treated as insubordination and could lead to disciplinary action, including termination. McCormack Email at 1 (ECF No. 53-10). Plaintiff ignored this warning. Once Kotait confirmed that Plaintiff went on the cruise, she recommended Plaintiff's termination to HR in December 2022, while Plaintiff was still away. ECF No. 52 at 154; ECF No. 54 at 11.

When Plaintiff returned to work on January 3, 2023, Kotait and McCormack did not signal that the matter was resolved. Instead, they immediately had a meeting where they gave Plaintiff an "Initial Disciplinary Action" form that documented her insubordination and expressly cautioned that "further consequences" could follow based on her actions. ECF No. 53-13 at 1. After this meeting, Plaintiff waited until Kotait was off the line and told only McCormack that she was pregnant. ECF No. 54 at 13. Plaintiff's instant characterization of her subsequent termination as an "abrupt escalation," ECF No. 55 at 15, is both speculative and contradicted by the record. UPS did not have to halt the pre-existing, pending termination recommendation simply because Plaintiff disclosed her pregnancy after it was made.

Plaintiff tries to escape this timeline by arguing that McCormack's knowledge should be imputed to the decision-makers, suggesting he must have influenced the final outcome. *Id.* at 17. Again, this argument is speculative and refuted by the evidence in this case. The undisputed evidence is that McCormack was a non-decision maker with respect to the termination decision,

and he never communicated Plaintiff's pregnancy to anyone else. ECF No. 49 at 131-32. Additionally, both Kotait, who recommended the termination, and Corral, who began coordinating with UPS legal counsel, testified that they did not have knowledge of Plaintiff's pregnancy. ECF No. 52 at 170; ECF No. 54 at 13.

Because Plaintiff's termination was already set in motion before her disclosure, Plaintiff cannot establish that her termination occurred under circumstances giving rise to an inference of discrimination.

2. UPS' Legitimate, Nondiscriminatory Reason

Even if Plaintiff could establish a prima facie case, the burden shifts back to UPS to articulate a legitimate, non-discriminatory reason for the adverse employment action. *See Doe*, 527 F.3d at 364. UPS easily satisfies this burden. UPS terminated Plaintiff's employment due to her insubordination. ECF No. 54 at 20-21. Specifically, Plaintiff's decision to take unapproved time off for a family cruise during a mandatory holiday blackout period after being repeatedly informed, both verbally and in writing, that her request for time off was denied. *Id.*

This non-discriminatory reason is documented throughout the record. McCormack promptly denied Plaintiff's initial leave request via email on September 7, 2022. *Id.* at 9. The following day, both McCormack and Kotait met with Plaintiff to reinforce the operational necessity of the blackout period restrictions. *Id.* On October 18, 2022, McCormack formalized these boundaries in a written warning, explicitly cautioning Plaintiff that unauthorized travel during peak season would be treated as insubordination that could lead to her termination. ECF No. 53-10 at 1. Despite these clear directives, Plaintiff abandoned her clients and took the cruise. ECF No. 54 at 11. An employee's direct defiance of managerial orders regarding

attendance during a critical business window is a legitimate, non-discriminatory reason for discharge. Accordingly, UPS has satisfied its burden under the second prong.

3. Pretext

To show pretext, a plaintiff must point to evidence which "(1) casts doubt upon the legitimate reason proffered by the employer such that a fact-finder could reasonably conclude that the reason was a fabrication; or (2) would allow the fact-finder to infer that discrimination was more likely than not a motivating or determinative cause of the employee's termination." *Doe*, 527 F.3d at 370.

To meet the first prong, "the plaintiff cannot simply show that the employer's decision was wrong or mistaken." *Fuentes v. Perskie*, 32 F.3d 759, 765 (3d Cir. 1994). Rather, the plaintiff "must demonstrate such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons . . . that a reasonable factfinder could rationally find them 'unworthy of credence.'" *Id.* (quoting *Ezold v. Wolf, Block, Schorr & Solis-Cohen*, 983 F.2d 509, 523 (3d Cir. 1992)). Plaintiff advances two primary arguments to show pretext, neither of which is persuasive.

First, Plaintiff points to the lack of an active administrative investigation upon her return, arguing that the record "reflects no meaningful new investigation, no interview of Plaintiff regarding any newly discovered misconduct, no request for her explanation, and no documented effort to gather additional facts" that would justify her termination. ECF No. 55 at 22. This argument misconstrues the evidence and ignores the reality of her insubordination. UPS did not have to launch a "new investigation" or conduct interviews because there were no new facts left to discover. Plaintiff's insubordinate conduct was already complete and verified. UPS spent months warning Plaintiff against taking the cruise. Once management confirmed that Plaintiff

had defied those orders and abandoned her territory during the peak holiday season, her insubordination was complete.

The subsequent administrative steps taken by UPS reflect corporate routine rather than discrimination. Kotait initiated a formal termination recommendation in December, which was then routed to HR Director Corral to address at a monthly standing meeting with the legal division. ECF No. 54 at 11-12. UPS's adherence to this process—rather than launching an investigation into a case of clear insubordination—would not allow a reasonable jury to disbelieve its stated rationale.

Second, Plaintiff contends that pretext is present because UPS only chose to escalate its response to termination after she disclosed her pregnancy to McCormack on January 3, 2023. ECF No. 55 at 18. This assertion is unsupported by the record. The uncontroverted evidence demonstrates that Kotait made the formal termination recommendation in December 2022. ECF No. 54 at 11. Management had to wait for the conclusion of the pre-scheduled January 2023 review meeting to proceed with the termination. *Id.* There is nothing in the record to suggest that the timing of this standing meeting was manipulated, accelerated, or manufactured in response to Plaintiff's disclosure to McCormack.

Finally, Plaintiff's broader argument that UPS's leave policies were "ambiguous" or "murky" fails to establish pretext. Even if an employee harbors a subjective misunderstanding regarding a corporate handbook, an employer's explicit, verbal and written denials eliminate any ambiguity. Plaintiff was told she could not go; she went anyway. Because Plaintiff has failed to submit record evidence casting doubt upon UPS's reason or suggesting that discrimination was the actual motivating factor, she cannot establish pretext. Accordingly, the Court will grant summary judgment on her Title VII and PHRA claims.

**B. FMLA Interference**[2]

To establish a claim of interference under the FMLA, a plaintiff must prove that: (1) she was an eligible employee under the FMLA; (2) the defendant was an employer subject to the FMLA's requirements; (3) she was entitled to FMLA leave; (4) she gave notice of her intent to take FMLA leave; and (5) she was denied benefits to which she was entitled under the FMLA. *Ross v. Gilhuly*, 755 F.3d 185, 191-92 (3d Cir. 2014).

Plaintiff's interference claim fails because there is no evidence that she ever gave notice of an intent to take FMLA leave, or that she was denied any such benefit. To the contrary, during her deposition, Plaintiff conceded that at the time of her termination she had not requested FMLA leave, nor had she contacted UPS's third-party leave administrator. ECF No. 53 at 46.

In addition, as discussed above, the record evidence clearly shows that UPS terminated Plaintiff for reasons unrelated to the exercise of any FMLA rights. Accordingly, UPS cannot be held liable for FMLA interference. *Lichtenstein*, 691 F.3d at 312; *see also Sarnowski v. Air Brooke Limousine, Inc.*, 510 F.3d 398, 403 (3d Cir. 2007) ("[T]he FMLA does not provide employees with a right against termination for a reason other than interference with rights under the FMLA."). Accordingly, summary judgment on the FMLA interference claim is also warranted.

---

2 Plaintiff is no longer pursuing an FMLA retaliation claim. Summ. J. Tr. at 5 (ECF No. 65).

## IV. CONCLUSION

The evidence shows that UPS terminated Plaintiff for clear insubordination and initiated her termination weeks before Plaintiff disclosed her pregnancy. As a result, Plaintiff cannot establish that UPS discriminated against her or interfered with her FMLA rights. The Court will grant UPS' motion for summary judgment. An appropriate Order will follow.

**BY THE COURT:**

Mary Kay Costello

MARY KAY COSTELLO, J.